Argued and submitted June 16, 2010, affirmed September 8, 2011

Jennifer Michelle HOLBERT,
*Petitioner-Respondent,*
*and*

Philip Mathew NOON, Sr.,
*Respondent-Appellant.*

Linn County Circuit Court
091449; A142678

260 P3d 836

Patrick L. Hadlock argued the cause for appellant. With him on the brief was Ringo, Stuber, Ensor & Hadlock, P.C.

No appearance for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Carson, Senior Judge.

HASELTON, P. J.

Armstrong, J., dissenting.

**HASELTON, P. J.**

Respondent in proceedings under the Family Abuse Prevention Act (FAPA) appeals, challenging the trial court's continuance of a FAPA restraining order pursuant to ORS 107.718. On appeal, as before the trial court, respondent invokes *State ex rel Juv. Dept. v. Dompeling*, 171 Or App 692, 17 P3d 535 (2000), and contends that the evidence is insufficient under the standard of imminence that we endorsed in *Dompeling* to establish that respondent had "abuse[d]" petitioner within 180 days of the filing of her petition for a restraining order, ORS 107.718(1), by "[i]ntentionally, knowingly or recklessly placing [petitioner] in fear of imminent bodily injury," ORS 107.705(1)(b). We disagree and, accordingly, affirm.

The notice of appeal in this matter was filed after June 4, 2009; consequently, and in the absence of any request pursuant to ORAP 5.40(8)(a) that we exercise our discretion to review this matter *de novo*, we decline to exercise our discretion to engage in such review.[1] ORS 19.415(3)(b). Rather, we review to determine whether "any evidence" establishes the requisites for the issuance of the FAPA restraining order. *See State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010) (reasoning, in the context of a mental commitment case, that, "[p]ursuant to ORS 19.415(3), unless we exercise our discretion to review the matter *de novo*, we are bound by the trial court's findings of historical fact that are supported by any evidence in the record; we further review the court's dispositional conclusions, predicated on those findings, for errors of law").

Viewed consistently with that standard of review, the record discloses the following: Petitioner and respondent lived together for roughly eight years and have two children, who were ages three and four at the time the FAPA petition was filed in late May 2009. The parties' relationship was volatile long before the events that precipitated the filing of the

---

[1] In his brief on appeal, respondent erroneously identifies our standard of review as *de novo*, citing *Strother and Strother*, 130 Or App 624, 883 P2d 249 (1994), *rev den*, 320 Or 508 (1995), without any reference to ORS 19.415(3)(b) and without any request pursuant to ORAP 5.40(8).

FAPA petition. Petitioner recounted two incidents that ante-dated the 180-day period preceding the filing of the petition:

> "Well, one night he pulled a gun while I was holding [one of the children] in my arms, put it in my hand and held it to his head and told me if I had any balls I would shoot him in the head. * * * The cops came out one night, he got on the phone with his buddy and said, 'We'll just throw her in the wood chipper.' "[2]

In late March or early April 2009, approximately two months before the FAPA petition was filed, petitioner moved out of the family home in Sweet Home and began living in an apartment in Albany. The parties' children remained with respondent after petitioner moved to Albany. Respondent told petitioner that, "if I ever take my kids from him that I would not be able to hide, that he would find me and he would kill me." Indeed, in the six months preceding the filing of the petition for a FAPA restraining order, respondent told petitioner a "numerous amount[ ] of times that he was going to kill me if I took my children and left."

The question of custody of the children became acutely contentious in late April. Respondent learned that petitioner had been dating another man, White; that White had pending sexual abuse charges against him in Linn County; and that White had been present when the parties' children had spent a night at petitioner's residence. Respondent filed a petition for custody of the parties' children on April 29, and petitioner was served with notice of the custody proceedings on May 2. Over the following two-week period, respondent sent petitioner several text messages that petitioner understood to threaten her with physical harm.

In particular, on May 4, respondent sent text messages to petitioner that read, "You fucked up bad this time, I won't rest and neither will my resources," and "Let the games begin, it's all over." Also on May 4, respondent drove by petitioner's residence and threatened White's cousin and, in petitioner's recounting, said, "[I]f he helped us out in any way, he was gonna kill him and his family."

---

[2] Although the timing of those events is imprecise, it appears that the first described event was roughly three years before the FAPA proceeding.

On May 12, respondent sent petitioner another text message that read:

> "One chance to set it right. No guy friends, no Wal-Mart, no cell phone, no old friends. Think hard if you want your life back and what you're willing to sacrifice for it. No more games. Last shot or it's all over and not just us."

Petitioner understood that message to convey a threat.[3]

On May 27, petitioner filed for, and the court issued, an *ex parte* FAPA restraining order. Respondent requested a hearing. At the conclusion of the testimony at the FAPA hearing, respondent's counsel argued that the evidence was insufficient to establish that respondent had "abused" petitioner within 180 days of the filing of the petition:

> "[S]he needs to show that there was a threat to cause imminent bodily injury, and I do not get that out of the text messages, not any of the ones that she's alleged. And I don't think that there's any statutory basis to issue the order."

In that connection, respondent's counsel explicitly and exclusively invoked *Dompeling* "for the proposition that imminent means immediate or close at hand." The trial court disagreed:

> "I think that there[ ] [are] veiled threats in there. Based upon her testimony, which I believe, about violence in the past, I think those threats are legitimate."

Accordingly, the trial court continued the FAPA restraining order, and this appeal ensued.

ORS 107.718(1) provides that a court may issue a FAPA restraining order on a showing

> "[(1)] *that the petitioner has been the victim of abuse committed by the respondent within 180 days preceding the filing of the petition,* [(2)] that there is an imminent danger of further abuse to the petitioner[,] and [(3)] that the respondent represents a credible threat to the physical safety of the petitioner or the petitioner's child[.]"

---

[3] At the FAPA hearing, when asked by the court if respondent had caused her any physical injury within the preceding six months, petitioner responded, "He's gotten close to, but told me he didn't want to leave bruises on me as evidence."

(Emphasis added.) "Abuse" is defined, in turn, as

"the occurrence of one or more of the following acts between family or household members:

"(a)   Attempting to cause or intentionally, knowingly or recklessly causing bodily injury.

"(b)   *Intentionally, knowingly or recklessly placing another in fear of imminent bodily injury.*

"(c)   Causing another to engage in involuntary sexual relations by force or threat of force."

ORS 107.705(1) (emphasis added).

On appeal, respondent reiterates his contention before the trial court that the evidence was legally (and factually) insufficient to establish the requisite "imminent" threat constituting "abuse" within the meaning of ORS 107.705(1)(b). Respondent's argument in that regard reads, in its entirety, as follows:

"There was certainly no evidence at all of any communication from [respondent] that could conceivably place [petitioner] in 'fear of imminent bodily injury.' There were some text messages that clearly related to the tensions raised by a prospective custody fight. The context and timing of the text messages were such that any reasonable person would understand them as showing frustration over the ending of a relationship and the beginning of a custody fight. This is especially true in light of the testimony concerning [petitioner's] post move out visits to [respondent's] house. It is also true in light of the fact [respondent] was concerned that [petitioner] was living with a person charged with a sex abuse crime.

"[Respondent] cited the case of [*Dompeling*] to the trial court. The court construed the word 'imminent' in this case. It found it to mean a threatened injury that is 'near at hand, impending or menacingly near.' 171 Or App at 695. Again, there are no facts in this case that can be said to show, by a preponderance of the evidence, that [respondent] committed abuse by placing [petitioner] in fear of imminent injury."[4]

(Record citation omitted.)

---

[4] Respondent filed a five-page appellate brief; petitioner did not appear on appeal.

Thus, as before the trial court, respondent relies exclusively on the majority opinion in *Dompeling*. Respondent does not offer any analysis as to the content and construction of "imminent" beyond invoking and embracing *Dompeling*. Much less does respondent suggest that *Dompeling*, on which his position is predicated, was wrongly decided.

In *Dompeling*—a juvenile delinquency case, which did not involve the issuance of a FAPA order—we construed the meaning of "imminent" for purposes of the crime of menacing. ORS 163.190. Specifically, we addressed whether the evidence there established that the youth had "by word or conduct * * * intentionally attempt[ed] to place [her mother] in fear of imminent serious physical injury." *Id.*

The facts in *Dompeling* were simple: The youth lived with her mother and became very upset after her mother unplugged the telephone to keep her from using it. 171 Or App at 694. In an escalating confrontation, the youth became more and more angry and told her mother, "I wish you were dead, I um, I could stab you right now." *Id.* (internal quotation marks omitted). A minute later—apparently after briefly disengaging—the youth returned and said to her mother, "I thought about doing it while you were in your sleep." *Id.* (internal quotation marks omitted). The youth was subsequently adjudicated for engaging in conduct that would have constituted menacing if she had been an adult. *Id.*

On appeal, the youth's only argument was that her words did not embody or express the statutorily requisite threat of "imminent serious physical injury." *Id.* at 695. As we explained,

> "[y]outh reasons that she did not threaten to stab her mother immediately. Rather, youth argues that she only 'threatened to get a weapon and return, some hours later, and attack her mother after the mother had gone to bed.' Youth concludes that[,] because 'the threatened harm was not imminent,' the state failed to prove its case."

*Id.*

In *Dompeling*, we began by construing the pivotal statutory term "imminent":

"We look initially to the common understanding of the word. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). Imminent is defined as:

"'ready to take place: near at hand: impending ‹our ˷ departure›; usu : hanging threateningly over one's head: menacingly near ‹in ˷ jeopardy› ‹this ˷ danger›.'

"*Webster's Third New Int'l Dictionary*, 1130 (unabridged ed 1993) (capitalization omitted). Understood in its usual sense, the word does not require that the state prove a threat of immediate injury. It is sufficient if the threatened injury is 'near at hand,' 'impending,' or 'menacingly near.' Nothing in the remainder of the statute suggests that the word is not used in its usual sense, and youth does not argue that the constitution requires a more restrictive interpretation. *See State v. Garcias*, 296 Or 688, 698, 679 P2d 1354 (1984)."

171 Or App at 695.

Applying that definition, we determined that both of the youth's statements threatened the requisite "imminent" injury. *Id.* at 695-96. In that regard, we noted, in part, that "[t]he threat of being stabbed within the next few hours is sufficiently near at hand to be imminent." *Id.* at 696.[5]

---

[5] Judge Armstrong filed a lengthy dissent in *Dompeling*, most of which was predicated on a constitutional analysis never suggested by the appellant. *Dompeling*, 171 Or App at 696-702 (Armstrong, J., dissenting). The two concluding paragraphs of the dissent took issue with the majority's application of the plain-meaning construction of "imminent":

"The conditional nature of youth's first statement indicates that the utterance, even if a threat, did not satisfy the imminence requirement of ORS 163.190. Because the statement was made in the conditional tense, and thus merely indicated the theoretical possibility of an assault, it was necessarily too indefinite to convey the idea that such an assault was immediately forthcoming or impending. *See Webster's Third New Int'l Dictionary*, 1130, 1132 (unabridged ed 1993) (defining 'imminent' as 'ready to take place: near at hand: impending' and defining 'impend' as 'to threaten from near at hand or as in the immediate future'). The majority errs in relying on youth's use of the words 'right now' to conclude otherwise. Because the statement expressed a possibility rather than a purported certainty or even a probability, the words 'right now' add no substance to the indefinite statement.

"Similarly, the second statement cannot be construed as indicative of 'imminent' danger because it cannot be read to signify that such danger was near at hand or forthcoming in the immediate future; in fact, the second statement has no specific future reference point. Even accepting the majority's conclusion that an assault that evening while the mother slept would have been imminent, the statement does not indicate that the proposed harm is any more likely to occur that evening than any other day or evening. Phrased as a

*Dompeling* is not, of course, a FAPA case. Nor have we ever cited its construction of "imminent," for purposes of criminal menacing, in the context of a FAPA appeal. However—and whatever the propriety or validity of the cross-cutting linkage of concepts of "imminent" in the criminal menacing context with those in the FAPA context—it is apparent that in our FAPA precedents we have endorsed an understanding of "imminent" akin to that expressed in *Dompeling. See, e.g., Lefebvre v. Lefebvre,* 165 Or App 297, 301-02, 996 P2d 518 (2000) (affirming issuance of FAPA restraining order where the respondent, who had engaged in no actual or overtly threatening physical violence, had, *inter alia*, engaged in volatile and "obsessive" conduct toward his estranged wife, including screaming obscenities at her in the presence of the parties' child, rummaging through her drawers and her garbage, making frequent hang-up calls to her house, calling her late at night and describing accurately what she was wearing to bed, and tapping at her window at 1:30 a.m.); *see also Cottongim v. Woods,* 145 Or App 40, 44, 928 P2d 361 (1996) (affirming issuance of FAPA restraining order where the respondent's conduct included telling the petitioner, his former girlfriend, that "he could not live without her and, if he were going to die, she should too" and that "he would do anything he could to make [her] life hell" (internal quotation marks omitted; brackets in original)).

Applying that construct to this case, and viewing the evidence and reasonable attendant inferences as we must—that is, in the light most favorable to the trial court's disposition—we conclude that the trial court did not err in issuing the FAPA restraining order.

Consistently with the trial court's disposition and its explicit finding that wife was credible in her testimony "about violence in the past," the record discloses the following salient circumstances:

description of youth's past state of mind and lacking any reference to the future, the statement merely indicates that thoughts about hurting mother have crossed youth's mind at some point in the past. The majority errs in reading into the statement a reference to that very evening."

*Id.* at 702-03.

*First*—as informative context of the parties' relationship—respondent had threatened to kill petitioner on numerous occasions antedating the 180-day statutory "window." In one instance, respondent had told a friend that "[w]e'll just throw her in the wood chipper."

*Second*, within the 180-day period, including after petitioner had left respondent and begun dating another man (White), respondent repeatedly told petitioner that, if she ever tried to take their children, he would find and kill her.

*Third*, again as context, after petitioner began dating White, and as respondent's preoccupation and animosity about that relationship heightened, on May 4, 2009, respondent threatened to kill one of White's relatives and his family if the relative supported petitioner and White in their relationship.

*Fourth*, also on May 4, respondent sent petitioner text messages saying, "I won't rest and neither will my resources," and "Let the games begin, it's all over."

*Fifth*, and finally, on May 12, 2009, and in the totality of the foregoing circumstances, respondent sent petitioner the following text message:

> "One chance to set it right. No guy friends, no Wal-Mart, no cell phone, no old friends. Think hard if you want your life back and what you're willing to sacrifice for it. No more games. Last shot *or it's all over and not just us*."

(Emphasis added.)

Consistently with our prior FAPA decisions addressing and applying the "imminent" requirement—and with *Dompeling* to the extent that its construction is (as respondent urges) transferable to the FAPA context—those circumstances were legally sufficient to establish that respondent "plac[ed] [petitioner] in fear of imminent bodily injury." ORS 107.705(1)(b). Specifically, regardless of whether respondent's conduct toward petitioner antedating the May 12 text message was sufficient, the trial court could properly determine that, in the totality of the circumstances, including respondent's repeated death threats, that message—and especially its final phrase ("it's all over and not just us")—

evinced the requisite imminence. *See, e.g., Lefebvre,* 165 Or App at 301-02 (assessing the respondent's obsessive conduct in context of the petitioner's familiarity with the respondent's protracted obsession nine years before with killing his former employer); *cf. Dompeling,* 171 Or App at 695 (for purposes of ORS 163.190, state need not "prove a threat of immediate injury. It is sufficient if the threatened injury is 'near at hand,' 'impending,' or 'menacingly near.' ").

To be sure, under our former regimen of *de novo* review, we could have determined the matter differently. That is not because we would have, or could have, employed a different construct of "imminent." Rather, it is because we could have drawn different reasonable inferences from the ominous, arguably ambiguous, final phrase of the May 12 text message.[6] But that is not the point: Rather, subject to limited exceptions not invoked here, we are no longer in the business of *de novo* review. Accordingly, we are not free to substitute our inferential assessment of the facts for the trial court's differing, but nevertheless reasonable, assessment. Thus, we affirm the issuance of the FAPA order.

We do so without addressing the substance of the dissent for the following reasons.

First, the dissent bears no relationship to respondent's arguments before the trial court and on appeal. Respectfully, and with due appreciation for what is so clearly the product of careful thought by an esteemed colleague, the dissent is entirely a freelance exercise by the author. Its only point of even fleeting contact with respondent's arguments is *Dompeling*—which respondent embraces, and the dissent argues must be overruled. *See* 245 Or App at 354, 361-62 (Armstrong, J., dissenting).

We fully acknowledge the dictates of *Stull v. Hoke,* 326 Or 72, 77, 948 P2d 722 (1997), in matters of statutory construction. But *Stull* does not confer, much less mandate, a roving commission to reexamine our precedents that have

---

[6] As noted, 245 Or App at 332, the trial court found that respondent had communicated "veiled threats" to petitioner. On appeal, respondent, as appellant, does not contend that imposition of a FAPA order in the circumstances presented here would violate Article I, section 8, of the Oregon Constitution.

construed and applied statutory language when no party has disputed those precedents. We recently reiterated that essential principle:

> "We understand that, under [*Stull*], we are 'responsible for identifying the correct interpretation [of a statute], whether or not asserted by the parties.' That responsibility arises, however, only when the parties have put the issue of statutory interpretation before us by disagreeing as to what a statute means; in such situations, we are not limited to choosing the better of two erroneous interpretations. Here, the factual and procedural predicates for statutory interpretation simply have not arisen. Defendant loses, not because a correct interpretation of ORS 137.101(1) compels that outcome, but because she has not adequately preserved the argument that would have put the meaning of the statute at issue."

*State v. Shepherd*, 236 Or App 157, 163, 236 P3d 738 (2010) (second brackets in *Shepherd*). So too here.[7]

Second, prudential principles of *stare decisis* compellingly militate against adopting the dissent's putative approach as the law of this court. That is so regardless of any abstract merit of the dissent's deconstruction of the provenance and linkage of common-law assault, the crime of menacing, and the FAPA statutes—matters, again, on which we imply no view. Rather, our transcendent prudential concern arises from the coincidence of three circumstances: (1) The dissent is, necessarily, predicated on its construction of "imminent" as used in the criminal menacing statute, ORS 163.190—which, in turn, necessitates overruling *Dompeling*; (2) the state is not a party to this appeal; and (3) petitioner has never appeared on appeal. The upshot is that, if we were to adopt the dissent, we would be overruling our construction of ORS 163.190 in a case in which the state is not a party and cannot seek reconsideration or Supreme Court review—and, indeed, in which no reconsideration or review is ever possible

---

[7] The dissent remonstrates that "respondent is entitled to have us decide *his* case correctly." 245 Or App at 363 (Armstrong, J., dissenting) (emphasis in original). With respect, the "case" posited and decided by the dissent bears no resemblance to the "case" presented by respondent. Reasonable minds can, and do, differ about the proper role of appellate judges in divining and reaching the "correct" outcome. And yet, in the end, we are—as we must be—subject to the constraints of the principled functioning of our adversarial system of justice.

because petitioner has not appeared before us. There may be cases in which, even within the strictures of *stare decisis*, *Dompeling* might be revisited—but this is not one of them.

Finally, we offer a practical observation that may, in its own way, partake of *stare decisis*. Over the years, as evidenced by our case law, trial courts have employed FAPA orders to defuse volatile, sometimes potentially lethal, domestic disputes. There is always the risk—which the present respondent emphasizes—of manipulation of that process, especially in the context of custody disputes. But the protective utility of FAPA orders, albeit imperfect, is patent. If the dissent were adopted, an estranged spouse could tell another, "I'm going to kill you tomorrow," or "If you get custody, you're dead"—and no FAPA order could issue.

That would, presumably, be surprising—more likely, shocking—to the trial court judges and attorneys, including family law specialists, who litigate and adjudicate FAPA matters every day in Oregon courtrooms. If we were to adopt the dissent's approach in this procedural posture, we would be sponsoring a parade of horribles without any potential for prompt Supreme Court review of that result. We decline to do so.

The trial court did not err in issuing the FAPA restraining order.

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority affirms the continuance of a Family Abuse Prevention Act (FAPA) restraining order against respondent, based on its application of our existing case law to the facts of this case. As I will explain, it errs in doing that because our cases have applied an erroneous understanding of the FAPA provision at issue here, ORS 107.705(1)(b), and should be disavowed. Based on a correct understanding of the applicable provision, the trial court erred in continuing the FAPA restraining order.

Petitioner and respondent lived together for roughly eight years and were the parents of two children, who were ages three and four at the time of the FAPA hearing.

Petitioner moved out of the family home in Sweet Home and began living in an apartment in Albany two months before the court issued the restraining order. The parties' children remained with respondent after petitioner moved to Albany. According to one witness, who had lived in the family home during the six months before issuance of the restraining order, petitioner and respondent had interacted amicably for some time after petitioner had moved out, with petitioner periodically returning to the family home to visit the children and to have respondent fix her car.

Things changed when respondent learned that petitioner had begun dating another man, White. In particular, tensions escalated when respondent learned at the end of April 2009 that White had pending sexual abuse charges against him in Linn County and that White had been present when the parties' children had spent a night at petitioner's residence. Respondent filed a petition for custody of the parties' children on April 29, and petitioner was served with notice of the custody proceedings on May 2. Over the following two-week period, respondent sent petitioner several text messages that petitioner understood to threaten her with physical harm.

On May 4, respondent sent text messages to petitioner that read, "You fucked up bad this time. I won't rest and neither will my resources[,]" and "Let the games begin, it's all over." Another text message stated, "Nice mole on right side of [White's] chin. Whore in Albany. No license. You can sure pick them." Because White has a mole on the right side of his chin, the text message led petitioner to believe that respondent was following her. However, a mutual friend of the parties subsequently testified that she had received a photograph of White as an attachment to a text message from petitioner and had forwarded the photograph to respondent. Petitioner further testified that respondent had driven by her residence on May 4 and "threatened [White's] cousin and said if he helped us out in any way, he was gonna kill him and his family."

Petitioner and respondent had another conversation on May 12. Petitioner testified: "On May 12th[, respondent] had wanted me to come over and talk with him, that was the

only way I could see my children." That conversation included a text message from respondent to petitioner that read:

"One chance to set it right. No guy friends, no Wal-Mart, no cell phone, no old friends. Think hard if you want your life back and what you're willing to sacrifice for it. No more games. Last shot or it's all over and not just us."

Petitioner also testified that respondent had told her many times over the preceding six months that, if petitioner ever tried to take the children from him, he would find her and kill her. She also described the following events that had occurred roughly three years earlier:

"Well, one night he pulled a gun while I was holding my three year old in my arms, put it in my hand and held it to his head and told me if I had any balls I would shoot him in the head. He has threatened to kill me [on] numerous [occasions]. The cops came out one night, he got on the phone with his buddy and said, 'We'll just throw her in the wood chipper.'"

When asked by the court if respondent had caused petitioner any physical injury within the past six months, she responded, "He's gotten close to, but told me he didn't want to leave bruises on me as evidence." However, she did testify that, approximately five or six years earlier, respondent had "grabbed [petitioner's] head and was gonna slam it into" some object.

At the conclusion of the hearing, the trial court was "more convinced than not" that there was "reason for the restraining order." Respondent objected that the text messages had not threatened petitioner with physical injury and, even if they had, that the threatened injury was not imminent, as that term is used in the FAPA statute. He further noted that petitioner had filed her petition for the FAPA restraining order only after having been served with notice of the custody proceedings for the children, in essence arguing that petitioner had sought the restraining order as a way to obtain custody of the children. The court disagreed, finding that there were "veiled threats" in the messages and that it believed petitioner's testimony "about violence in the past." The court entered an order continuing the restraining order

for its full one-year duration, ORS 107.716(6), and also granting petitioner custody of the parties' children.

After holding a hearing, a court may continue a previously issued FAPA restraining order if it finds, by a preponderance of the evidence, that

"[(1)] the petitioner has been the victim of abuse committed by the respondent within 180 days preceding the filing of the petition, [(2)] that there is an imminent danger of further abuse to the petitioner[,] and [(3)] that the respondent represents a credible threat to the physical safety of the petitioner or the petitioner's child[.]"

ORS 107.718(1). Abuse is defined, in turn, as

"the occurrence of one or more of the following acts between family or household members:

"(a)  Attempting to cause or intentionally, knowingly or recklessly causing bodily injury.

"(b)  *Intentionally, knowingly or recklessly placing another in fear of imminent bodily injury.*

"(c)  Causing another to engage in involuntary sexual relations by force or threat of force."

ORS 107.705(1) (emphasis added).

Thus, for a FAPA restraining order to be continued in a case such as this one—involving infliction of fear of bodily injury rather than infliction or attempted infliction of such injury—the record must contain, among other things, evidence to support a finding that, within 180 days before the FAPA petition was filed, the respondent had engaged in conduct that had placed the petitioner in "fear of imminent bodily injury." ORS 107.705(1)(b); ORS 107.718(1). In order to determine whether the record supports such a finding in this case, we must determine the conduct that the legislature intended ORS 107.705(1)(b) to cover. As I will explain, the development and legislative history of the FAPA statutes establishes that ORS 107.705(1)(b) applies to conduct akin to that proscribed in the crime of menacing, ORS 163.190, that is, conduct that occurs in a face-to-face confrontation that places the victim in fear of being promptly physically injured by the actor.

The Oregon legislature enacted the original FAPA statutes in 1977. *See* Or Laws 1977, ch 845, §§ 3-8 (codified at ORS 107.700 - 107.720 (1977)). The statutes were enacted as one part of a two-part effort to address domestic violence. The principal thrust of the effort was to alter the response of police officers to calls involving episodes of domestic violence. Typically, when responding to such calls, police officers would not arrest people—who most often were men—who had physically abused or were in the midst of abusing their domestic partners. Rather, they would try to defuse the conflict and offer help to victims, such as driving them to a motel or shelter.[1]

The solution on which the legislature settled to address that problem was to enact a provision that required police officers to arrest the abuser unless the abuser's domestic partner objected. The provision that the legislature enacted was added as subsection (2) to ORS 133.055 (1977), the statute that authorizes police officers to issue criminal citations to people accused of committing misdemeanors (or felonies that are subject to misdemeanor treatment) rather than arresting them. As originally enacted, subsection (2) provided:

"Notwithstanding the provisions of subsection (1) of [ORS 133.055 (1977) on issuing a citation in lieu of arrest], when a peace officer is at the scene of a domestic disturbance and he has probable cause to believe that an assault has occurred between spouses, former spouses or persons of opposite sex residing together or who formerly resided together, or to believe that one such person has placed the other in fear of imminent serious bodily injury, and unless the victim objects, he shall arrest and take into custody the alleged assailant or potential assailant."

---

[1] A witness who testified before the legislature in support of the 1977 legislation provided a particularly arresting account of that phenomenon:

"I spoke with a woman about two weeks ago. Her husband assaulted her with a hammer. The husband refused to vacate the premises. The woman had no money and no way to get to her family. When the police volunteered her accommodations in the local drunk-tank, the woman gratefully accepted the invitation."

Testimony, House Committee on Judiciary, HB 2438, Apr 6, 1977, Ex K (statement of Kalei Luyben).

Or Laws 1977, ch 845, § 1 (codified at ORS 133.055(2) (1977)).[2]

The provision identifies two misdemeanors, assault and menacing, that would typically be committed during an episode of domestic violence and that, but for the provision, would not be crimes for which officers would be required to arrest the person committing them. One of the two crimes, assault, was identified by its name;[3] the other, menacing, was identified by its operative terms. *Compare* ORS 133.055(2), *with* ORS 163.190(1). The identification of the two crimes was an essential feature of the provision because the authority to arrest depends on the commission of a crime by the person to be arrested, so the statute had to identify crimes for which abusers could be arrested.

The second part of the two-part effort was to establish a procedure by which people who had been subjected to domestic abuse could protect themselves against further abuse by obtaining a court order imposing restraints on those who had committed the abuse. Although it has since been modified, the procedure that the legislature established is the procedure by which a person obtains a FAPA restraining order. *See* Or Laws 1977, ch 845, §§ 3-8 (codified at ORS 107.700 - 107.720 (1977)).

Critically, the 1977 legislature defined abuse for purposes of FAPA in terms of the crimes that it had identified in the provision that became subsection (2) of ORS 133.055 (1977)—*viz.*, assault and menacing—together with the crime of attempted assault. As enacted, abuse was defined to mean

"the occurrence of one or more of the following acts between family or household members:

"(a) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury.

---

[2] The legislature later amended the statute to eliminate the provision that required police officers to leave an alleged abuser with the victim if the victim objected to the officers arresting the abuser. *See* Or Laws 1981, ch 779, § 1.

[3] The assault to which the statute refers is fourth-degree assault, ORS 163.160, because that is the only assault crime that is a misdemeanor. The counterpart FAPA definition of abuse, ORS 107.705(1)(a), confirms that understanding, because it defines abuse in terms of fourth-degree assault. *Compare id., with* ORS 163.160.

"(b) Placing another in fear of imminent serious bodily injury."

Or Laws 1977, ch 845, § 5(1) (codified at ORS 107.705(1) (1977)). *Compare id.*, *with* ORS 163.160(1)(a) (fourth-degree assault), ORS 163.190(1) (menacing), *and* ORS 161.405(1) (attempt).

The linkage between the crimes identified in subsection (2) of ORS 133.055 (1977) and the conduct defined as abuse for purposes of FAPA was deliberate, as confirmed by the legislative history of the bill. As originally introduced, the bill that the legislature enacted to establish FAPA, House Bill (HB) 2438 (1977), identified "assault or battery" as the crimes that would give rise to an arrest under ORS 133.055 by police officers who arrived at the scene of a domestic disturbance. HB 2438, § 1 (1977). It did not include menacing as one of the crimes.

The definition of abuse, in turn, included as conduct constituting abuse "[p]lacing another in fear of imminent bodily injury." *Id*. § 5. That definition tracks the conduct that constitutes the crime of menacing, except for the omission of the word "serious" between "imminent" and "bodily." *Compare id., with* ORS 163.190(1).

At a May 2, 1977, work session on the bill, the House Judiciary Committee amended the language identifying the crimes in ORS 133.055 for which officers would be required to arrest people by removing the reference to "battery" and replacing it with conduct constituting the crime of menacing. *See* Minutes, House Committee on Judiciary, HB 2438, May 2, 1977, at 2-5, 9; *id*. Exs 1 & 2. *Compare* HB 2438, § 1 (1977), *with id*. (A-Engrossed). It also amended the definition of abuse to insert the word "serious" between "imminent" and "bodily," thereby making the definition on placing a person in fear of bodily injury conform to the definition of the crime of menacing. *See* Minutes, House Committee on Judiciary, HB 2438, May 2, 1977, at 6. As reflected in the minutes of the hearing, the legal counsel for the committee, Dennis Bromka, confirmed to the committee the purpose of the amendment:

"The next amendment Mr. Bromka mentioned would insert 'serious' after the word 'imminent' on page 3, line 13 of the

printed bill—to conform with the definition of the crime of 'menacing.' Rep. Myers moved for adoption and committee members present unanimously approved."

*Id.*; *see* HB 2438, § 5 (1977). The enacted version of the bill included those amendments to ORS 133.055 and to the definition of abuse. *See* Or Laws 1977, ch 845, §§ 1, 5.

The evolution of HB 2438 confirms that the legislature sought to protect victims of domestic violence in two ways. First, it identified two misdemeanors, assault and menacing, that might occur during an episode of domestic violence and amended ORS 133.055 to require police officers who arrive at the scene of a domestic disturbance to arrest people who have committed those crimes during the disturbance. Second, it defined domestic abuse in terms of assault and menacing, together with the crime of attempted assault, and created a process by which people whose domestic partners have subjected them to domestic abuse could obtain a FAPA restraining order to protect them against further abuse.

Since 1977, the legislature has amended the definition of abuse in two ways that are relevant to the understanding of that term. However, because the legislature originally defined the type of abuse at issue in this case in terms of the crime of menacing, it is necessary to identify the conduct that constitutes that crime before turning to the later amendments.

The crime of menacing, ORS 163.190, was enacted as part of the 1971 revision of the Oregon Criminal Code. *See* Or Laws 1971, ch 743, § 95. Because the crime was derived from Oregon's criminal assault statutes, the evolution of those statutes provides important context for the menacing statute.

Before 1971, Oregon's criminal assault statutes had remained essentially unchanged since their enactment in 1843. *E.g.*, *State v. Garcias*, 296 Or 688, 692, 679 P2d 1354 (1984). "At early common law, assault encompassed two separate concepts, the crime of attempted battery and the civil action for intentionally placing another in apprehension of an immediate battery." *Id.* (citing R. Perkins, *Criminal Law* 117

(2d ed 1969)). By 1971, it was understood that the tort concept of assault—that is, conduct causing apprehension of an immediate battery—had been incorporated into the crime of assault in Oregon so that criminal assault included both "an act which reasonably puts one in fear of corporal injury" and "an act intended to cause corporal injury by one who has the present ability to carry out such intent." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 94, at 95 (July 1970) (hereinafter Commentary to Proposed Oregon Criminal Code).

The 1971 revision of the criminal code separated those two concepts. It did that by reorienting Oregon law to limit criminal assault to the infliction of physical injury. Under that approach, the crime of attempted battery—one of the two concepts embodied in common-law criminal assault—became the crime of attempted assault. *See id.* at 94-95. In turn, "the tort law derived concept of 'intentional creation of the apprehension of receiving a battery' [that] exist[ed] in * * * Oregon case law" in 1971 became the crime of menacing. *Id.* at 95.

The commission characterized the proposed crime of menacing as

"a compromise between codes which equate an attempted battery with a tortious assault (Model Penal Code, Ill., Minn., La.) and those codes which recognize no crime unless the actor intended to inflict a battery (Wisc.). As an example: $X$ with intent to frighten $Y$, points a gun at $Y$ which $Y$ thinks is loaded but which in fact is not loaded. Under the Model Penal Code such conduct would constitute a simple assault. ([Model Penal Code] 211.1 (1) (c)). Under the proposed draft and the New York and Michigan codes such conduct would constitute the lesser crime of menacing. The conduct would not constitute either assault or attempted assault since physical injury was neither inflicted nor intended."

Commentary to Proposed Oregon Criminal Code § 95, at 96.

The commentary went on to explain that the new menacing statute was "intended to cover not only menacing physical acts but also threatening words unaccompanied by a

physical movement." *Id.* For example, according to the commission, "[t]he following conduct would be considered menacing: *X* stands with his right hand in his coat pocket and threatens to shoot *Y*." *Id.* Furthermore, the commission distinguished the crime of menacing from "[c]onditional threats of violence made to coerce another to engage or refrain from engaging in conduct," because the latter conduct was "covered by the [proposed criminal code] section on coercion." *Id.*

Finally, the commission described the relationship of the proposed menacing statute to existing law:

"Oregon case law in defining assault includes the element of apprehension in its definition:

" 'An intentional, unlawful offer of corporal injury to another by force, or force unlawfully directed toward the person of another, under such circumstances as create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt, if not prevented, constitutes an assault.' *State v. Linville*, 127 Or 565, 572, 273 P 338 (1928).

"But as pointed out in *State v. Wilson*, 218 Or [575], 346 P2d 115 (1959) the act of placing one in apprehension of receiving a battery is not assault unless there is also the intent to inflict injury:

" '. . . apprehension of injury on the part of the victim need not be shown to make out the crime. Further, it seems clear that an act done with the intention to *place one* in *apprehension* of *injury only* and *not* to *inflict corporal injury* would not constitute the crime of assault in this state. And too, according to the definition, an act done with the intention to inflict corporal injury but where the actor did not have the present ability to inflict corporal injury would not be a criminal assault.' [*Id.* at] 584.

"The proposed draft, therefore, creates a new offense of menacing to cover the situation where the actor places or attempts to place another person in fear of imminent serious bodily harm and where serious injury is neither intended nor inflicted."

Commentary to Proposed Oregon Criminal Code § 95, at 96-97 (emphasis in original). In other words, menacing is

intended to cover assaultive conduct of the type described in *Linville*, that is, conduct creating "a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt," 127 Or at 572, but it does not require the actor to intend to cause physical injury, as required in *Wilson*.

From that commentary and the provenance of the crime of menacing, it is apparent that the legislature intended ORS 163.190(1) to prohibit a person involved in the type of confrontation encompassed by common-law assault from putting another person in fear of imminent physical injury, whether by actions or words.[4] Thus, ORS 163.190(1) requires that the person who is threatening another person with physical injury be engaged in a direct confrontation with the other person that puts the other person in fear that the confrontation will promptly culminate in a physical injury that the actor appears to have the present ability to inflict. It follows that the menacing statute's requirement of "imminent" physical injury was meant to capture a very short period of time—that is, the time that it would take a person who is engaged in a confrontation with another person to promptly follow through on an implied or expressed threat of violence made during the confrontation.

That understanding of "imminent" is consistent with the imminency that was embodied in the civil tort of assault—from which the menacing statute was derived—when ORS 163.190(1) was adopted in 1971. In particular, that understanding of imminency in ORS 163.190(1) tracks

---

[4] The Supreme Court's analysis in *State v. Garcias* bolsters that conclusion. In *Garcias*, the defendants challenged the constitutionality of ORS 163.190, arguing, in part, that the menacing statute violated Article I, section 8, of the Oregon Constitution. The court rejected that challenge by tying the interpretation of the statute to common-law assault:

"We interpret the menacing statute with reference to its common law assault origins. Common law assault could only occur in a face to face confrontation in which the harm threatened would be caused by the threatener. Implicit in the term 'menacing' is a hostile relationship between the actor and victim. And by [the menacing] statute's terms, the threatened harm must be imminent and serious. * * * *There is no indication in the legislative history, beyond the extension of the crime to words unaccompanied by gestures, that the statute deviates from any other feature of the common law offense.*"

*Garcias*, 296 Or at 699 (emphasis added).

the treatment of the tort of assault in the *Restatement (Second) of Torts*. Section 29 of the *Restatement* is entitled "Apprehension of Imminent and Future Contact," and it provides:

"(1) To make the actor liable for an assault he must put the other in apprehension of an imminent contact.

"(2) An act intended by the actor as a step toward the infliction of a future contact, which is so recognized by the other, does not make the actor liable for an assault[.]"

*Restatement (Second) of Torts* § 29 (1965).

The commentary to and illustrations for section 29 elaborate on the meaning of "imminent" in the tort of assault:

"Comment on Subsection (1):

"b. *The apprehension created must be one of imminent contact, as distinguished from any contact in the future.* 'Imminent' does not mean immediate, in the sense of instantaneous contact, as where the other sees the actor's fist about to strike his nose. *It means rather that there will be no significant delay.* It is not necessary that one shall be within striking distance of the other, or that a weapon pointed at the other shall be in a condition for instant discharge. *It is enough that one is so close to striking distance that he can reach the other almost at once, or that he can make the weapon ready for discharge in a very short interval of time.*

"Illustrations:

"1. A and B are engaged in an altercation in A's shop. B refuses to leave A's shop at A's order. A collects his workmen, who muster around B, tucking up their sleeves and aprons and threatening to break B's neck if he does not leave. A and his workmen are subject to liability to B.

"2. A threatens to strike B and rushes toward him with hand or weapon raised. A's purpose is frustrated while he is still some few feet from effective striking distance. A is subject to liability to B.

"3. A points an uncocked pistol at B, who knows it is uncocked. The pistol can be cocked and made ready for effective use in an instant. A is subject to liability to B.

"Comment on Subsection (2):

"c.   The point at which an act ceases to be preparation for future contact and threatens a contact so imminent as to be actionable, is incapable of statement so exact as to be automatically applicable to the circumstances of every case which may arise. What is imminent depends upon the circumstances of the particular case and is a matter for the judgment of the court or jury.

"Illustrations:

"4.   A threatens to shoot B and leaves the room with the express purpose of getting his revolver. A is not liable to B.

"5.   A, standing behind the counter of a shop, extends his arm across the counter toward B, a woman, with words indicating an intent to have sexual intercourse with her. Whether A is liable to B for an assault will depend upon whether B reasonably apprehends that A can reach her across the counter, or that he will immediately come around the counter and touch her."

*Id.* (emphasis added).

As the above commentary and illustrations make clear, the requirement of imminence in the tort of assault was meant to limit liability to those instances in which, during the course of a physical interaction, the actor causes the victim to become apprehensive that the actor will promptly subject the victim to unwanted physical contact. That comports with my understanding of the imminency requirement in the crime of menacing. And, given that the crime of menacing was derived directly from the tort concept of assault, I am further persuaded that the word "imminent" in ORS 163.190(1) was meant to capture a victim's fear that, during a face-to-face confrontation with another person, the other person will promptly physically injure the victim.

I recognize that we applied a different understanding of ORS 163.190(1) in *State ex rel Juv. Dept. v. Dompeling*, 171 Or App 692, 17 P3d 535 (2000). In *Dompeling*, a youth was found to be within the jurisdiction of the juvenile court for conduct constituting the crime of menacing, based on threatening statements that she had made to her mother after

"her mother had unplugged the telephone to keep youth from using it. When asked what [had] occurred that evening, mother testified:

> " 'Well, she came into the bathroom and said that she wanted to use the phone. And when I said no, she got more angry, and more angry, and she finally just came in and said, "I wish you were dead, I um, I could stab you right now." And then she came back a minute later, and said, "I thought about doing it while you were in your sleep." ' "

*Id.* at 694. The youth contended on appeal that neither of her threats constituted a threat of "imminent injury" under the menacing statute and, hence, that the juvenile court had erred in finding her to be within its jurisdiction.

To resolve the issue, we looked to the common understanding of the word "imminent" and concluded, based on dictionary definitions, that a threatened injury is imminent if it is " 'near at hand,' 'impending,' or 'menacingly near.' " *Id.* at 695. Based on that understanding, we considered whether either of the two statements that the youth had made to her mother had threatened her mother with imminent serious physical injury:

> "She stated initially, 'I could stab you right now.' Youth does not dispute that she intended to place her mother in fear of serious physical harm, and her use of the words 'right now' makes the threatened injury imminent. The fact that youth did not have a knife in her hand when she made that statement does not cause us to reach a different conclusion. Youth's second statement also threatened imminent injury. It was approximately eight o'clock in the evening when youth told her mother that she could stab her in her sleep. The threat of being stabbed within the next few hours is sufficiently near at hand to be imminent. The trial court correctly held that youth [had] attempted to put her mother in fear of imminent serious physical injury."

*Id.* at 695-96 (footnote omitted).

As that discussion indicates, we interpreted the menacing statute without considering the history behind it and the commentary of the Criminal Law Commission that explained the statute's derivation from, and relationship to,

common-law assault. In light of those sources, it is evident that we erred in *Dompeling* in relying on dictionary definitions of "imminent" to determine the reach of the menacing statute, because it led us to apply the statute to conduct that is not covered by it—*viz.*, the statements made by the youth in the case. The fact that the youth did not have a knife with her in the bathroom means that she could not have promptly acted on her first threat to stab her mother, because she did not have the "apparent present ability" to do that. The youth's second statement to her mother—that the youth had thought about stabbing her after she had gone to sleep, that is, several hours after the youth made the statement—also did not constitute menacing, both because the youth did not have a knife and because of the several-hour interval between the statement and the threatened action. The youth's statements might be understood to have threatened her mother with physical injury if she did not allow the youth to use the telephone and, hence, to have constituted attempted coercion,[5] but they did not constitute menacing.

We do not overrule a case " 'unless error is plainly shown to exist.' " *Newell v. Weston*, 156 Or App 371, 380, 965 P2d 1039 (1998), *rev den*, 329 Or 318 (1999) (quoting *Multnomah County v. Sliker*, 10 Or 65, 66 (1881)). That standard is met here because it is plain that we erred in our interpretation of ORS 163.190(1) in *Dompeling*.[6] We should correct our error by overruling *Dompeling* in this case because a correct understanding of the FAPA provision at issue depends on a correct understanding of the menacing statute.

---

[5] ORS 163.275(1) provides, among other things, that a

"person commits the crime of coercion when the person compels or induces another person to engage in conduct from which the other person has a legal right to abstain * * * by means of instilling in the other person a fear that, if the other person refrains from the conduct compelled or induced * * *, the actor or another will:

"(a) Unlawfully cause physical injury to some person;

"* * * * *

"(c) Engage in conduct constituting a crime[.]"

[6] Further, our interpretation of ORS 163.190 in *Dompeling* cannot be reconciled with the Supreme Court's interpretation of the statute in *Garcias*. In *Garcias*, the court construed ORS 163.190, as I have, to be limited to conduct that would constitute common-law assault, as modified to include threatening words unaccompanied by gestures. *See* 245 Or App at 350 n 4 (Armstrong, J., dissenting).

In light of a correct understanding of the menacing statute, ORS 163.190(1), and the 1977 Legislative Assembly's decision to base the definition of abuse in ORS 107.705(1)(b) on the crime of menacing, it follows that, in order to commit abuse under ORS 107.705(1)(b), the actor must place the victim in fear that, during a direct interaction between the actor and the victim, the actor will promptly physically injure the victim.[7]

As noted earlier, the legislature has amended the definition of abuse in ORS 107.705(1)(b) in two respects since 1977. Neither of those amendments affects my understanding of the statute for purposes of this case.

The first change was made in 1981 to add the mental states "intentionally, knowingly or recklessly" to the definition of abuse in ORS 107.705(1)(b). The impetus for that change came from Judge Albin Norblad, who testified about several bills pending before the 1981 legislature, including House Bill (HB) 2104, and expressed his concern about the mental state that a petitioner had to prove in order to prove abuse under ORS 107.705(1)(b). He explained that the Marion County Circuit Court had relied on the crime of menacing to require FAPA petitioners alleging abuse under ORS 107.705(1)(b) to include an allegation that the alleged abuser had "intentionally" placed the petitioner in fear of imminent serious physical injury. *See* Minutes, House Committee on Judiciary, HB 2104, Feb 27, 1979, at 3 (statement of Judge Albin Norblad). He questioned whether that was the appropriate mental state to use under the statute.

The House Judiciary Committee responded to the question raised by Judge Norblad by amending HB 2104 to insert into ORS 107.705(1)(b) the same mental states listed for assault in the FAPA definition of abuse in ORS 107.705(1)(a), *viz.*, "intentionally, knowingly or recklessly." *Compare* HB 2104 (1981), *with* Or Laws 1979, ch 161. In making that change, nothing suggests that the 1981 legislature intended to alter the core feature of abuse under ORS 107.705(1)(b)—*viz.*, that the person placing another person in

---

[7] Of course, that is the type of conduct that can occur during a domestic disturbance for which ORS 133.055 was amended in 1977 to require police officers to arrest people who have engaged in that conduct. *See* Or Laws 1977, ch 845, § 1.

fear of imminent physical injury has done so in a direct confrontation that puts the other person in fear that the confrontation will promptly culminate in a physical injury that the actor appears to have the present ability to inflict.

The second change was made in 1999 through Senate Bill (SB) 318 to remove the word "serious" from the definition of abuse in ORS 107.705(1)(b). The impetus for that change came from Judge Stephen Herrell of the Multnomah County Circuit Court, who noted that the definition of serious physical injury in the criminal code, which is the definition applicable to the crime of menacing, required an injury that " 'creates a substantial risk of death or which causes serious and * * * protracted impairment of health or protracted loss or impairment of the function of any bodily organ.' " Testimony, House Committee on Judiciary, Subcommittee on Civil Law, SB 318, May 12, 1999, Ex A (statement of Judge Stephen Herrell) (quoting ORS 161.015(8)). He said that that standard seemed to him "to be a ridiculously high standard for [a] petitioner to have to meet." *Id.* The legislature agreed with Judge Herrell and amended ORS 107.705(1)(b) to remove the word "serious" from the definition of abuse. *See* Or Laws 1999, ch 1052, § 12. That change altered the extent of the threatened physical injury that constitutes abuse under FAPA, but not the circumstances in which the threat of injury must occur.

Finally, the meaning of "imminent" in ORS 107.705(1)(b) is not affected by the different meaning of "imminent" in two other FAPA statutes, ORS 107.710(1) and ORS 107.718. As I will explain, the use of "imminent" in the latter statutes was intended by the 1999 legislature—which used that term in amending those statutes—to mean an interval of time that is different from the interval embodied in the definition of abuse in ORS 107.705(1)(b).

ORS 107.710(1) provides, as relevant:

> "Any person who has been the victim of abuse within the preceding 180 days may petition the circuit court for relief under ORS 107.700 to 107.735, if the person is in *imminent danger* of *further* abuse from the abuser. The person may seek relief by filing a petition with the circuit court alleging that the person is in *imminent danger* of abuse

from the respondent, that the person has been the victim of abuse committed by the respondent within the 180 days preceding the filing of the petition and particularly describing the nature of the abuse and the dates thereof."

(Emphasis added.) In turn, ORS 107.718 provides, in relevant part:

"(1)  * * * Upon a showing [(1)] that the petitioner has been the victim of abuse committed by the respondent within 180 days preceding the filing of the petition, [(2)] that there is an *imminent danger* of *further* abuse to the petitioner[,] and [(3)] that the respondent represents a credible threat to the physical safety of the petitioner or the petitioner's child, the court shall [issue a FAPA restraining order.]

"* * * * *

"(5)  *Imminent danger* under [ORS 107.718] includes but is not limited to situations in which the respondent has recently threatened petitioner with *additional* bodily harm."

(Emphasis added.)

The phrase "imminent danger," where italicized in the above quotations, was added to ORS 107.710(1) and ORS 107.718 by the 1999 Legislative Assembly to replace the phrase "immediate and present danger" in the prior version of the statutes. *See* Or Laws 1999, ch 1052, §§ 9, 13. Those changes were made in response to another proposal by Judge Herrell that the legislature "soften the standard [requiring] the petitioner [to] show 'immediate and present danger of [further] abuse' " in order to obtain a FAPA restraining order. Testimony, House Committee on Judiciary, Subcommittee on Civil Law, SB 318, May 12, 1999, Ex A (statement of Judge Stephen Herrell). Judge Herrell provided the following explanation of the need for the amendment:

"For example[,] at present, the Court cannot issue a FAPA restraining order in a situation whereby [a] petitioner [who has previously been abused] has just received a telephone threat from the abuser who happens to live in another town or another state but is threatening to come to harm the petitioner sometime in the imminent future. The same would be true if the abuser is incarcerated but the abuser's release

date is imminent but not immediate. There are, of course, many such examples.

"The usual response we get from petitioners in these cases is: 'I guess I have to wait until something bad actually happens to me.' Frankly, I have to agree, but it certainly seems like the wrong approach to me.

"Perhaps the solution would be to replace the words 'immediate and present danger' in ORS 107.710 [and ORS 107.718] with the words 'imminent danger.' This would conform to ORS 107.705(1)(b)."

*Id.*

Although Judge Herrell may have erroneously equated the meaning of "imminent" in ORS 107.705(1)(b) with the intended meaning of "imminent" in ORS 107.710(1) and ORS 107.718, it is evident that the 1999 legislature intended the word "imminent" to have a different meaning in ORS 107.710(1) and ORS 107.718 than it has in ORS 107.705(1)(b). Generally, when the legislature uses the same word or phrase in related statutory provisions, we will assume that it meant the word or phrase to have the same meaning. *See, e.g., Tharp v. PSRB*, 338 Or 413, 422, 110 P3d 103 (2005). However, that assumption must give way to more persuasive indications of the legislature's intent.

Here, the 1999 amendments to ORS 107.710(1) and ORS 107.718 were enacted 22 years after the legislature adopted the original FAPA statutes, including ORS 107.705(1)(b), and, thus, the amendments provide no insight into what the 1977 legislature intended the word "imminent" to mean in ORS 107.705(1)(b). Second, as demonstrated by the text and relationship of ORS 107.705(1)(b), ORS 107.710(1), and ORS 107.718(1), the word "imminent" is used to address two distinct circumstances, and the respective meanings of "imminent" in those statutes differ accordingly. ORS 107.705(1)(b) defines conduct by which a person commits abuse. As the legislative history makes clear, the legislature intended "imminent," as used in ORS 107.705(1)(b), to describe the same period of time as the term describes in the crime of menacing—that is, the very short period associated with common-law assault. *See* 245 Or App at 344-52 (Armstrong, J., dissenting).

In contrast, ORS 107.710(1) requires a petitioner who has been abused to allege, and ORS 107.718(1) requires the trial court to determine, that the petitioner is in "imminent danger of further abuse" in order for the court to issue or continue a FAPA restraining order. As Judge Herrell's testimony in support of SB 318 suggests, the legislature intended "imminent" in those statutes to refer to a period of time extending to several days. Imminent is a word that can convey that meaning. Its use in ORS 107.710(1) and ORS 107.718 to describe *that* length of time does not alter or affect the intended meaning of imminent in ORS 107.705(1)(b), which describes a much shorter period of time. In light of the distinct purposes and legislative histories of ORS 107.705(1)(b), ORS 107.710(1), and ORS 107.718, it is evident that the meaning of imminent in ORS 107.705(1)(b) is not the same as the meaning of imminent in ORS 107.710(1) and ORS 107.718.

As with our interpretation of the menacing statute in *Dompeling*, we have applied ORS 107.705(1)(b) of the FAPA statute in several cases without considering the evolution and legislative history of it. For example, in *Lefebvre v. Lefebvre*, 165 Or App 297, 996 P2d 518 (2000), we upheld a FAPA restraining order that was based on abuse under ORS 107.705(1)(b) for conduct that does not meet the standard that the statute imposes. *See also, e.g., Fielder v. Fielder*, 211 Or App 688, 157 P3d 220 (2007); *Cottongim v. Woods*, 145 Or App 40, 928 P2d 361 (1996). To the extent that our earlier cases applied an implicit understanding of ORS 107.705(1)(b) that differs from the correct understanding of it, we should disavow those cases.

With the proper understanding of ORS 107.705(1)(b) in mind, I turn to whether petitioner established that respondent had subjected her to abuse within 180 days before she filed her petition for a FAPA restraining order. As the following discussion explains, the record in this case is insufficient to support a finding by the trial court that, within that period, respondent had abused petitioner by intentionally, knowingly, or recklessly placing her in fear of imminent bodily injury.

I begin with petitioner's testimony about respondent's repeated threats to find and kill petitioner if she tried to take the parties' children. Respondent's threats to do that do not come within the definition of abuse in ORS 107.705(1)(b) because they are conditional and future oriented. They describe what respondent would do if an event occurs in the future, one that depends on a sequence of events in which petitioner would act to take the children from respondent. While certainly meant to intimidate and coerce petitioner, respondent's threats to kill her if she did that are not the type of threat that communicates that petitioner is in danger of promptly being physically injured by respondent. The legislative history of ORS 163.190(1) demonstrates that the statutory prohibition on "plac[ing] another person in fear of imminent serious physical injury" was specifically not meant to address "[c]onditional threats of violence made to coerce another to engage or refrain from engaging in conduct," because threats of that kind were intended to be "covered by the [proposed criminal code] section on coercion." Commentary to Proposed Oregon Criminal Code § 95, at 96. And, as discussed above, that understanding of the requirement of imminency in the crime of menacing was intended by the legislature to also apply to the definition of abuse under ORS 107.705(1)(b). Accordingly, the conditional threats by respondent, which were meant to prevent petitioner from taking the parties' children from respondent, are insufficient to establish that respondent intentionally, knowingly, or recklessly placed petitioner in fear of imminent bodily injury.[8]

The text messages that respondent sent to petitioner also are insufficient to support a finding of abuse. Respondent sent petitioner those messages soon after he had filed his custody petition and petitioner had been served with it. Undoubtedly, the text messages conveyed the anger that respondent felt toward petitioner and were meant to intimidate her. However, none of the messages occurred in a context in which petitioner and respondent were engaged in a direct and proximate interaction that could place petitioner

---

[8] As the discussion of respondent's threats suggests, his threats could be understood to constitute the crime of attempted coercion. *See* 245 Or App at 352-55 & 355 n 7 (Armstrong, J., dissenting).

in fear that respondent would promptly physically injure her, as required by ORS 107.705(1)(b). It follows that the trial court erred in concluding that respondent had abused petitioner within 180 days of petitioner filing her petition for a FAPA restraining order and, thus, concomitantly erred in issuing an order continuing petitioner's FAPA restraining order against respondent.

The majority offers two reasons for its decision to affirm the court's order in this case without resolving the correct meaning of ORS 107.705(1)(b). It first asserts that respondent failed to raise an issue at trial or on appeal about the meaning of the statute. The majority is wrong.

Respondent argued at trial and argues on appeal that the text messages that he sent could not constitute abuse under ORS 107.705(1)(b) because, to the extent that they placed petitioner in fear that respondent would injure her physically, the threatened injury was not imminent, as that term is used in the statute. That argument squarely presents for our decision the meaning of "imminent" in the statute. And, consistently with *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997), that means that we must determine the correct meaning of the term without regard to the parties' understanding of it.

According to the majority, however, respondent's reliance on *Dompeling* as support for his understanding of the meaning of "imminent" in ORS 107.705(1)(b) makes the *Stull* interpretive principle inapposite. It does not. The fact that the correct understanding of "imminent" in ORS 107.705(1)(b) conflicts with the meaning that we gave that term in interpreting the menacing statute in *Dompeling* does not affect our obligation to correctly interpret ORS 107.705(1)(b). In other words, *Dompeling* simply represents authority on which respondent relies to support an incorrect understanding of ORS 107.705(1)(b), *viz.*, an understanding that *Stull* requires us to reject.

To be sure, as my examination of the legislative history of FAPA and the menacing statute makes clear, the meaning of "imminent" in ORS 107.705(1)(b) and the menacing statute is intertwined in such a way as to require us to overrule *Dompeling* in the course of correctly interpreting

ORS 107.705(1)(b), because the correct interpretation of ORS 107.705(1)(b) depends on the correct interpretation of the menacing statute. However, our need to do that does not alter our obligation under *Stull* to interpret ORS 107.705(1)(b) correctly.[9]

The majority also relies on *dicta* in *State v. Shepherd*, 236 Or App 157, 163, 236 P3d 738 (2010), as support for its decision not to apply *Stull* in this case. *Shepherd* is readily distinguishable from this case.

*Shepherd* involved a challenge to the imposition of a compensatory fine against the defendant in favor of the victim whose automobile the defendant had used without authorization and wrecked. The defendant argued at trial that the court could not impose such a fine because a requirement of the compensatory fine statute, ORS 137.101(1)—*viz.*, that the victim to whom the fine is awarded be a person who "has a remedy by civil action" against the defendant for injuries suffered by the victim as a result of the criminal act for which the defendant was convicted—had not been proven. On appeal, the defendant made an altogether different argument—*viz.*, that the state had not proven a requirement of an entirely different statute, ORS 31.710, that the victim be someone who had suffered "objectively verifiable monetary losses."

As we explained, under those circumstances,

"the factual and procedural predicates for statutory interpretation simply [had] not arisen. Defendant loses, not because a correct interpretation of ORS 137.101(1) compels that outcome, but because she has not adequately preserved the argument that would have put the meaning of [that] statute at issue."

236 Or App at 163. That principle has no application to this case. The statute that we must interpret, ORS 107.705(1)(b), is the statute to which respondent's argument at trial and on

---

[9] *Cf. Townsquare Media, Inc. v. Brill*, No. 10-3017, 2011 WL 2906162, at *6 (7th Cir, July 21, 2011) (questioning norm under which United States Supreme Court is reluctant to reconsider precedent unless asked by party to do so, noting that "lawyers are reluctant to ask a court to overrule one of its decisions—let alone a string of them—because it smacks of desperation ('I can win only if you admit that your previous decisions were wrong')").

appeal is directed. It happens to be inextricably intertwined with the menacing statute, but, as explained above, that does not alter our obligation under *Stull* to interpret it correctly.

In summary, respondent preserved an argument about the meaning and application of ORS 107.705(1)(b) in this case. The majority errs in concluding otherwise.

The second reason that the majority advances for its refusal to resolve the meaning of ORS 107.705(1)(b) in this case is a prudential one, based on

"the coincidence of three circumstances: (1) The dissent is, necessarily, predicated on its construction of 'imminent' as used in the criminal menacing statute, ORS 163.190—which, in turn, necessitates overruling *Dompeling*; (2) the state is not a party to this appeal; and (3) petitioner has never appeared on appeal. The upshot is that, if we were to adopt the dissent, we would be overruling our construction of ORS 163.190 in a case in which the state is not a party and cannot seek reconsideration or Supreme Court review—and, indeed, in which no reconsideration or review is ever possible because petitioner has not appeared before us. There may be cases in which, even within the strictures of *stare decisis*, *Dompeling* might be revisited—but this is not one of them."

245 Or App at 339-40.

I appreciate those considerations. However, respondent is entitled to have us decide *his* case correctly. To the extent that the majority believes it to be inappropriate for us to overrule *Dompeling* without giving the state the opportunity to present arguments against our doing that, we can ask the state to submit its arguments in this case. It makes no sense to me for us to say to respondent and others against whom FAPA restraining orders are entered under ORS 107.705(1)(b) that we cannot decide their cases correctly and must, instead, wait until we are presented with an appeal in a menacing case in which the state can defend the meaning that we gave the menacing statute in *Dompeling*.

As for the fact that petitioner did not appear on appeal in this case, that is a common occurrence in FAPA cases. A review of our reported cases indicates that petitioners appear on appeal to defend FAPA restraining orders in

fewer than a quarter of our cases. That is not surprising, given that FAPA restraining orders expire within a year of their entry, ORS 107.716(6), which means that the great majority of them expire before we could consider an appeal of them. In that light, this case is typical. The upshot is that, as the majority says, a decision in this or similar cases to correctly resolve the meaning of ORS 107.705(1)(b) will not be subject to Supreme Court review. That cannot excuse us, however, from correctly deciding this case. If this were the first case that required us to interpret ORS 107.705(1)(b) and the menacing statute, we could not decline to do that even though our decision would not be subject to Supreme Court review. That this case is not the first case should not affect our approach to it.

Finally, the majority suggests that adoption of the understanding of ORS 107.705(1)(b) that I have presented— an understanding that I believe that I have established to be the correct understanding—could leave some people at risk of injury or death because they could not obtain FAPA restraining orders under ORS 107.705(1)(b) that would have been available to them under the superseded understanding of the statute. Our task is to interpret the statute in accordance with the legislature's intended meaning for it. I have done that in my dissent. To the extent that people are dissatisfied with the policy chosen by the legislature to protect people from domestic violence, the solution lies with the legislature. Our policy views have no legitimate bearing on our decision in this case.

I respectfully dissent.